Donna Silver, Esq., State Bar No. 90395
Dennis M. Elber, Esq., State Bar No. 70746
STOLPMAN, KRISSMAN, ELBER & SILVER LLP
111 West Ocean Boulevard, Suite #1900, Long Beach, CA 90802
Phone: 562/435-8300; Fax: 562/435-8304
E-Mail: dsilver@skeslaw.com; elber@skeslaw.com;  jk@skeslaw.com

John N. Tedford, IV, Esq., State Bar No. 205537
Richard K. Diamond, Esq., State Bar No. 070634
DANNING, GILL, DIAMOND & KOLLITZ, LLP
1900 Avenue of the Stars, 11th Floor, Los Angeles, CA 90067-4402
Phone: 310/277-0077; Fax:  310/277-5735; E-Mail: jtedford@dgdk.com;
Rdiamond@dgdk.com

Attorneys for Claimant, Art Pack, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:                                                      )<br>                                                              )<br>GEORGES MARCIANO, *et al.,*          )<br>                                                              )<br>                                    Debtors.         )<br>_____ )<br>Art Pack, Inc.                                        )<br>                                                              )<br>        Contested Matter Claimant,      )<br>                                                              )<br>                        vs,                              )<br>                                                              )<br>DAVID GOTTLIEB, solely in his        )<br>capacity as Chapter 11 Trustee for    )<br>the Estate of Georges Marciano,       )<br>                                                              )<br>        Contested Matter Objector.      )<br>_____ )| Case No.:   2:15-CV-15-444<br><br>**MOTION TO WITHDRAW**<br>**BANKRUPTCY REFERENCE**<br><br><br>*Not Yet Assigned:*<br>Date:<br>Time:<br>Judicial Officer: |

TO THE ABOVE-ENTITLED COURT, ALL PARTIES, AND THEIR RESPECTIVE

COUNSEL OF RECORD HEREIN:

 Claimant, Art Pack, Inc, hereby submits its Motion to Withdraw Bankruptcy

Reference.

DATED: January 21, 2015          Respectfully Submitted,

                                                   STOLPMAN, KRISSMAN, ELBER
                                                   & SILVER LLP

                                                   By:___ s/ Dennis M. Elber
                                                   DONNA SILVER/DENNIS M. ELBER
                                                   Attorneys for Claimant, Art Pack
                                                   E-Mail: elber@skeslaw.com /
                                                                dsilver@skeslaw.com

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.  PURSUANT TO 28 U.S.C.A. § 157(b)(2)(B), ART PACK, INC.'S COMMON LAW MALICIOUS PROSECUTION PERSONAL INJURY ACTION IS A NON-CORE CLAIM THAT CAN ONLY BE LIQUIDATED BY AN ARTICLE III JUDGE . . . . . . . . . . . . . . .  3

III. JUDICIAL EFFICIENCY IS NOT SERVED BY THE CONTINUING PARTICIPATION OF THE BANKRUPTCY COURT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

IV.  THE SETTLEMENT THAT CONTROLS DISTRIBUTION OF MARCIANO'S ESTATE TO ART PACK, INC. AND THE JUDGMENT CREDITORS WAS REACHED IN MONTREAL IN 2013 WITH NEITHER PARTICIPATION OF NOR NOTICE TO ART PACK, INC. . . . . . . . . . . . . . . . . . . . . . .  8

V.   ART PACK, INC.'S CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

VI.  THE SETTLEMENT AGREEMENT, PROVIDING ALMOST $90 MILLION TO MARCIANO'S VICTIMS, WAS REASONABLE, PROVIDED GOOD FAITH IMPLEMENTATION AND ALLOCATION . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

VII. THE STATE COURT PROCEEDINGS OF THE  JUDGMENT CREDITORS, STATE APPELLATE FINDINGS, AND THE FACTUAL AND LEGAL RELATIONSHIP OF ART PACK, INC.'S CLAIM TO THOSE OF THE JUDGMENT CREDITORS . . . . . . . . . . .  17

VIII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

i

---

# TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                    <u>**Page(s)**</u>

*Adelson v. Smith (In Re Smith)*
   389 B.R. 902, 908 (Bankr.D.Nev.2008) . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Anthony v. Baker (In Re Baker)*
   86 B.R. 234, 236 (D.Colo.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Asgari v. City of Los Angeles*
   15 Cal.4th 744, 754 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Bertero v. National General Corp.*
   13 Cal.3d 43, 50 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Buckwalter v. Nevada Bd. of Med. Examiners*
   678 F.3d 737, 743, 744 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . 22

*Citi-Wide Preferred Couriers, Inc. v. Golden Eagle Ins. Corp.*
   114 Cal.App.4th 906, 914 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Danning v. Bozek (In Re Bullion Reserve of North America)*
   836 F.2d 1214, 1217 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Evangelatos v. Superior Court*
   44 Cal.3d 1188, 1203 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Fein v. Permanente Medical Group*
   38 Cal.3d 137, 159-160 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gottlieb v. Iskowitz*
   2012 WL 2337290, *1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hall v. Perry (In re Cochise College Park)*
   703 F.2d 1339, 1357 (9th Cir.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In Re Arnold*
   407 B.R. 849, 851-853 (Bkrtcy.Ct.M.D.N.C.2009) . . . . . . . . . . . . . . . . 4

*In Re County of Orange*
   179 B.R. 195, 202-03 (Bankr.C.D.Cal.1995) . . . . . . . . . . . . . . . . . . . . 15

*In Re Marciano*
   446 B.R. 407, 426 (Bankr. C.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . 12

*In Re Marshall*
   600 F.3d 1037, 1065 (9th Cir.2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In Re Mason*
   514 B.R. 852 (Bankr. E.D. Ky. 2014) . . . . . . . . . . . . . . . . . . . . . 5, 6, 20

---

*In Re Murchison*
   349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) . . . . . . . . . . . . 22

*In Re Murgillo*
   176 B.R. 524, 533 (9th Cir. BAP 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In Re Pierce*
   237 B.R. 748, 758 (Bankr.E.D.Cal.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In Re Poole Funeral Chapel, Inc.*
   63 B.R. 527, 530 (Bankr. N.D. Ala.1985) . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In Re Temecula Valley Bancorp, Inc.*
   B.R. 2014 WL 7150731 *3 (C.D.Cal. Dec. 8, 2014) . . . . . . . . . . . . . . . . . . 2

*Marciano v. Chapnick (In Re Marciano)*
   708 F.3d 1123, 1125 (9th Cir.2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Marciano v. Fahs (In Re Marciano)*
   459 B.R. (9th Cir. BAP 2011) . . . . . . . . . . . . . . . . . . . . . 3, 12, 13, 16, 10

*Marciano v. Iskowitz*
   2d Cir.No.B216029, 219558 . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 19

*Northwest Airlines, Inc. v. Camacho*
   296 F.3d 787, 791 (9th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*People v. Smith*
   198 Cal.App.4th 415, 431 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Stern v. Marshall*
   564 U.S. 131 S.Ct. 2594 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 22

*United States v. Carlton*
   534 F.3d 97, 100 (2d Cir.2008), cert. denied 555 U.S. 1038,
   129 S.Ct. 613, 172 L.Ed.2d 468 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Westmoreland Human Opportunities, Inc. v. Walsh*
   327 B.R. 561, 573 (W.D. Pa. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

iii

**Statutes And Codes**

11 U.S. Code
    Section 303(b)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

28 U.S. Code
    Section 157(b)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
    Section 157(c)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
    Section 157(b)(2)(B)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 23
    Section 157(b)(2)(O)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
    Section 157(b)(5)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5
    Section 157(d)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 23
    Section 1334  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

**PLAINTIFF's OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALT., SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Donna Silver, Esq., State Bar No. 90395
Dennis M. Elber, Esq., State Bar No. 70746
STOLPMAN, KRISSMAN, ELBER & SILVER LLP
111 West Ocean Boulevard, Suite #1900, Long Beach, CA 90802
Phone: 562/435-8300; Fax: 562/435-8304
E-Mail: dsilver@skeslaw.com; elber@skeslaw.com;  jk@skeslaw.com

John N. Tedford, IV, Esq., State Bar No. 205537
Richard K. Diamond, Esq., State Bar No. 070634
DANNING, GILL, DIAMOND & KOLLITZ, LLP
1900 Avenue of the Stars, 11th Floor, Los Angeles, CA 90067-4402
Phone: 310/277-0077; Fax:  310/277-5735; E-Mail: jtedford@dgdk.com;
Rdiamond@dgdk.com

Attorneys for Claimant, Art Pack, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No.: |
| GEORGES MARCIANO, *et al.,* | |
| Debtors. | **MOTION TO WITHDRAW BANKRUPTCY REFERENCE** |
| Art Pack, Inc. | |
| Contested Matter Claimant, | *Not Yet Assigned:* |
| | Date: |
| vs, | Time: |
| | Judicial Officer: |
| DAVID GOTTLIEB, solely in his capacity as Chapter 11 Trustee for the Estate of Georges Marciano, | |
| Contested Matter Objector. | |

## I.
## INTRODUCTION

This is a request for a forthwith partial withdrawal of the reference to bankruptcy court of 1:11-BK-10426, specifically withdrawal of the claim of Art Pack, inc. (Art Pack) pursuant to §§ 157(b)(2)(B) and 157(d) . This case is related to several prior district court filings, e.g., CV-12-1284-AHM.

Art Pack seeks personal injury damages caused by Debtor George Marciano's (Marciano) state court malicious prosecution of Art Pack.  Withdrawal is permissive "for

cause shown." 28 U.S.C. § 157(d).  "To determine whether cause for permissive withdrawal exists, a district court should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn." *In re Temecula Valley Bancorp, inc*. _B.R. _  2014 WL 7150731 *3 (C.D.Cal. Dec. 8, 2014). (internal references omitted.)

Marciano was worth at least $185 million when he decided to ruin a group of persons whose only transgression was that none of them would lie for him.  Within a short time, Marciano used his wealth to maliciously initiate and abusively pursue theft claims against Art Pack, an S corporation owned by Ali Mohajeri and operated along with his wife Ellana Mohajeri. Exh. 1, Second Amended  Complaint., Case Number BC375824.

The Trustee has explained that "the matter before this Court is simple and straightforward. Pre-petition, the Debtor filed two lawsuits in state court against people he claimed had stolen from him (the 'Lawsuits'). [1] fn. [1]:  One suit was against Joseph Fahs, Steven, Chapnick, Miriam Choi, Amille Abat, Elizabeth Tagle, Deborah McLeod and Art Pack, and one was against Gary Iskowitz, Carolyn Malkus and Gary Iskowitz & Company, LLP.  (Collectively all of the defendants listed above (with the exception of Deborah McLeod and Art Pack, who did not countersue), along with Theresa Iskowitz, are 'Appellees'." Dkt. #395 p. 2:4-10 and fn.1.

Art Pack was granted summary judgment on January 16, 2009. Exh.2 , Dkt. 2232, at pgs. 20-33.  Marciano dismissed his appeal of  Art Pack's  judgment on December 9, 2010. Exh. 2, Dkt. 2232, at pgs. 34- 41.

While Art Pack was waiting for final favorable termination, the *Fahs* and *Iskowitz* judgment creditors had secured default judgments in 2009. "While the appeals of the Petitioning Creditors' judgments were pending, various judgment creditors began collection efforts. The Petitioning Creditors then filed an involuntary petition, pursuant to § 303(b)(1) of the Bankruptcy Code, against Marciano in the United States Bankruptcy Court for the Central District of California." *Marciano v. Chapnick (In re*

2

*Marciano*), 708 F.3d 1123,1125 (9th Cir.2013).

Marciano had immediately objected to bankruptcy jurisdiction on numerous grounds, primarily that cases still on appeal could not constitute a bona-fide judgment and that the involuntary bankruptcy had not been filed in good faith. The bankruptcy court, Judge Kaufman, ruled against Marciano, who then appealed to the Bankruptcy Panel. A divided court affirmed. *Marciano v. Fahs* (*In re Marciano*), 459 B.R. 27 (9th Cir. BAP 2011). Marciano appealed to the 9th circuit, which stayed the bankruptcy proceeding from July 19, 2012 to November 7, 2012, while the 9th circuit considered and ultimately rejected a Marciano motion. Exh.3. Thereafter, on February 27,2013,  a divided panel allowed the involuntary bankruptcy to continue.  *Marciano v. Chapnick* (*In re Marciano*), 708 F.3d 1123,1128-1129 (9th Cir.2013).

## II.

### PURSUANT TO 28 U.S.C.A. § 157(b)(2)(B), ART PACK'S COMMON LAW MALICIOUS PROSECUTION PERSONAL INJURY ACTION IS A NON-CORE CLAIM THAT CAN ONLY BE LIQUIDATED BY AN ARTICLE III JUDGE

District courts have original jurisdiction over bankruptcy cases and all civil proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334. "Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. See §§ 157(b)(1), (c)(1)." *Stern v. Marshall*,——U.S. ——, 131 S.Ct. 2594 (2011).

Core proceedings may be heard and determined by a bankruptcy judge. § 157(b)(1).   The bankruptcy judge may also hear, but not determine,   non-core proceedings which are otherwise related to the case under title 11. § 157(c)(1). However, the bankruptcy court's findings and conclusions in a non-core proceeding are not final and are subject to de novo review. *Id*.

Congress has specifically identified "personal injury torts" as non-core and prohibited bankruptcy judges from "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes

3

of distribution in a case under title 11." §157(b)(2)(B). See also §§ 157(b)(2)(O) and157(b)(5).

Shortly after the Act was passed, malicious prosecution was recognized as a personal injury tort for purposes of §157 when a claimant alleged "that the debtor/defendant is liable under § 1983 for the personal injury tort of malicious prosecution. Plaintiff obviously has alleged a personal injury tort." *Anthony v. Baker (In re Baker)*, 86 B.R. 234, 236 (D.Colo.1988).

The Supreme Court has noted that there is a split among the courts about "the scope of the phrase 'personal injury tort'—a question over which there is at least a three-way divide, see In re *Arnold*, 407 B.R. 849, 851–853 (Bkrtcy.Ct.M.D.N.C.2009)." *Stern v. Marshall*, 564 U.S. ——, 131 S.Ct. 2594, 2606 n.4 (2011).

A few courts have construed the term as requiring an actual physical injury. This is the view Judge Kaufman apparently subscribes to:

> THE COURT: So I mean like that is -- there's no doubt that the Court can do final rulings on claims against the estate.
> MR. ELBER: A personal injury claim?
> THE COURT: Yes. Well, this isn't a personal injury claim; this is a company ...There is no personal injury claim here -- by this corporation. 9/19/13 RT p.11:18-23; Exh. 4.

However, this view is inconsistent with the California common law claim of malicious prosecution. A claim for malicious prosecution is subject to California Code of Civil Procedure § 340(3), California's personal injury statute of limitations as a claim for an infringement of personal rights, not property rights. *Northwest Airlines, Inc. v. Camacho*, 296 F.3d 787, 791 (9th Cir.2002).

"Malicious prosecution protects the personal interest in freedom from unjustifiable litigation." *Asgari v. City of Los Angeles*, 15 Cal.4th 744, 754 (1997) (internal citation and quotation omitted.) "The malicious commencement of a civil proceeding is actionable because it harms the individual against whom the claim is made..." *Bertero v. National General Corp.*, 13 Cal.3d 43, 50 (1974) A cause of action for malicious prosecution exists when unjustifiable litigation is used as an instrument

4

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

"with which to maliciously injure a small business and its owner." *Citi–Wide Preferred Couriers, Inc. v. Golden Eagle Ins. Corp.*, 114 Cal.App.4th 906, 914 (2003)

"If Congress had intended to restrict 'personal injury tort ... claims' to those which damaged the bodies of living claimants, it could have done as it did in section 522(d)(11)(D) of the Bankruptcy Code where it exempted to the debtor up to $7,500 'on account of personal bodily injury....' It is thus clear that Congress knew how to be restrictive in its choice of language concerning personal injury torts. When Congress chose the unrestricted description of 'personal injury tort ... claims', it must have intended that these words be interpreted broadly." *In re Poole Funeral Chapel, Inc*., 63 B.R. 527, 530 (Bankr. N.D.Ala.1985).

It is likely the 9th Circuit will reject the narrow "bodily injury" statutory interpretation and include as personal injury those claims which "are traditionally thought of as the 'common law torts'... Accordingly, without deciding whether statutory tort claims are covered, this court is convinced that the Ninth Circuit would adopt nothing less than the middle ground, and it would therefore hold that the libel claims at issue here are personal injury tort claims within the meaning of 28 U.S.C. § 157(b)(5)." *Adelson v. Smith (In re Smith)*, 389 B.R. 902, 908 (Bankr.D.Nev.2008).

A defamation claim is "a common law claim for personal injury, which cannot be core." *In re Marshall*, 600 F.3d 1037,1065, (9th Cir.2010) (Kleinfield, J.,  concurring). "Bankruptcy court is the right place to litigate whether a debt was dischargeable." *Id*., at 1065, 1066.  "Bankruptcy court is the wrong place to litigate a common law claim for personal injury to final judgment." *Id*., at 1066.  "Article III precludes bankruptcy courts from entering  final judgments on tort claims founded on state law."  *Id.,* at 1068, 1069.

On August 7, 2014, §157 was thoroughly discussed in  *In re Mason*, 514 B.R. 852 (Bankr. E.D. Ky. 2014). "The decision to limit the Bankruptcy Court's assistance with personal injury and wrongful death claims is consistent with the reason the District Court utilizes the Bankruptcy Court—its bankruptcy expertise." *Id*., at 857. "The Bankruptcy Court has familiarity and expertise with business related torts and statutory causes of

MOTION TO WITHDRAW BANKRUPTCY REFERENCE

action that relate to these contractual relationships, such as fraud and consumer liability statutes, but the District Court is better equipped to deal with violations of a person's rights protected by statutorily created causes of action." *Id*., at 858.  In determining on a case by case basis when a statutory tort is included in Section 157, a court should decide whether it is a "case that stems from alleged conduct that violates the rights of the movants." *Id*., at 858. "Black's Law Dictionary defines 'personal injury' as not only 'bodily injury' but also 'any invasion of a personal right, including mental suffering and false imprisonment.' Black's Law Dictionary (9th. ed. 2009). The Restatement (Second) of Torts recognizes false imprisonment, defamation, and malicious prosecution as torts although they do not necessarily result in bodily injuries." *Id.*, at 858.

## III.

### JUDICIAL EFFICIENCY IS NOT SERVED BY THE CONTINUING PARTICIPATION OF THE BANKRUPTCY COURT

Judge Kaufman asserted that  bankruptcy court participation in Art Pack's claim was necessary for efficiency. Until May 31, 2014, Judge Kaufman's assertion was an arguable proposition.  And, when Judge Kaufman's evidentiary and legal rulings collapsed the hearing/trial into one day, April 10, 2014, it appeared that proposed findings would indeed be issued by May, 31, 2014.

The case had been pre-tried and an order issued. Exh. 5, Dkt. 2648. Art Pack filed a trial brief. Exh. 6, Dkt.2593. The Trustee and Creditors Committee (Objectors) filed a trial brief. Exh. 7, Dkt. 2606. At trial, Art Pack produced 18 witnesses through declaration. See e.g. Dkt's 2575 et. seq.  Only one of them, economist Peter Formuzis, was cross examined by the objectors who themselves produced no witnesses.

Art Pack filed an opening final argument on April 21, 2014. Exh. 8, Dkt. 2691. The Objectors filed their final argument on April 28, 2014. Exh. 9, Dkt. 2713. Art Pack filed its closing final argument on May 5, 2014. Exh. 10, Dkt. 2722.  Art Pack filed its proposed findings of fact and conclusions of law on April 21, 2014 and amendments thereto on April 23, 2014. Exhs.11 and 12, Dkts. 2697 and 2701. Objectors filed their

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

findings of fact and conclusions of law on April 28, 2014. Exh. 13, Dkt. 2714.

Judge Kaufman had refused to allow Art Pack an April, 2014 state court trial because of the May, 31, 2014 distribution date. "It's not going to be efficient to go to state court." 10/30/13, RT p.2:13-24, exh. 4.  "This Court is going to liquidate [Art Pack's claim], that's going to be the most efficient resolution."*Id*., RT, p.15:2, exh. 4. A state court trial would be "inefficient.  We are litigating it here."*Id*., RT, p. 21:9-10.

> THE COURT: "[I]t will interfere with the bankruptcy case, because we're going to be paying out–the plan provides for payout by end of May [and the] litigation in another forum would prejudice the interest of other creditors, the creditor's committees and other interested parties, who then have to go to state court, when they have counsel here for federal court [and] the interest of judicial economy and the expedition of economical determination litigation for the parties, definitely that's a factor in favor of keeping this Court keeping the -- it in this Court [and] delay, with respect to payout to other parties, pursuant to the plan. " 10/30/13 RT p.11:9-12:22; exh.4.

However, month by month, such judicial efficiency became increasingly remote as Judge Kaufman failed to act on Art Pack's claim.  On September 18, 2014, Art Pack asked when it could expect a decision, Judge Kaufman responded: "It will happen when it happens."9/ 13/14  RT p.6:1-6; Exh. 4. On January 8, 2015, over Art Pack's objection, Judge Kaufman ordered the parties to mediation. Exh. 14.

The final arguments and proposed findings of fact and conclusions illustrate polarized views of the evidence and law that are exceedingly unlikely even to be closed, let alone bridged, at a compulsory mediation.

Ultimately, the District Court will be required, both statutorily and constitutionally, to provide a de novo review of the evidence proffered in Art Pack's malicious prosecution claim. The promise of the bankruptcy court providing a forum for an efficient presentation of evidence, expeditious evaluation and optimal allocation of judicial resources has proved illusory.  Past is indeed prologue and it is respectfully submitted that efficiency also requires forthwith de novo consideration by the  District Court of the proffered evidence and applicable law.

///

///

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

**IV.**

**THE SETTLEMENT THAT CONTROLS DISTRIBUTION OF MARCIANO'S ESTATE To Art Pack AND THE JUDGMENT CREDITORS WAS REACHED IN MONTREAL IN 2013 WITH NEITHER PARTICIPATION OF NOR NOTICE TO Art Pack**

On May 7 and 8, 2013, in Montreal, Canada, with neither participation nor notice to claimant Art Pack, a settlement was reached among the Trustee, Judgment Creditors and Debtor Georges Marciano.

According to the Trustee's counsel, the May, 2013 settlement was due to a decision issued October 23, 2012 by the Canadian Court of Appeal for the Province of Quebec.  The Trustee stated that the Canadian Decision was "an enormously important decision because at that point, Mr. Marciano knew that he could not hide behind the Canadian Courts anymore." 9/18/14, RT 14:25-15:2.  Exh. 4.

The Canadian Decision informed that "[o]n September 14, 2011 the legal saga moved to Montreal where Marciano now lives. That day, Fahs et al., ...filed four motions." *Id*., at ¶ 15, Exh. 15. [Please note that a part of the Opinion is in French, but the entire opinion is also in English.]. The Canadian Appeals Court extensively reviewed what had brought the case before it, issued certain rulings adverse to both sides and then recommended settlement.  "The best solution no doubt remains a settlement out of court, an option that would be the best means of bringing an end to a legal saga for which both Marciano and the US creditors bear responsibility.  ¶ ¶ 119-121, Exh. 15.

On October 23, 2012, the Canadian Decision had recommended settlement; on October 29, 2012, the 5 *Fahs* judgment creditors were awarded $10 million each by the California appeals scourt divided equally between non economic compensatory damages and punitive damages; on November 7, 2012, the 9th Circuit lifted the bankruptcy stay; on February 27, 2013, the 9th Circuit affirmed the involuntary bankruptcy proceeding; in March, 2013, the three Iskowitz parties received $37.5 million in a second default prove-up with Gary Iskowitz, chairman of the creditors committee, receiving $29 million of the total.

The next stop was May in Montreal, and the trimuvirate decided that there was no need for further appellate review of Iskowitz' and the damages could be fixed without further ado.  As of May, 2013, the trimuvirate decided that the correct amount for all the victims to share in equitably just happened to be just about the amount that the judgment creditors had all been awarded in default proceedings plus one half of an appeals review.

Now, given the details provided almost a year earlier to the Trustee of Art Pack's lost profits amounting to at least $20 million, once could entertain the belief that the judgment creditors knew their awards were inflated enough to be able to comfortably withstand awarding Art Pack full and fair damages. One could, until one read the settlement agreement that provided that Marciano would be returned any monies from the $90 million after the judgment creditors had been paid. Any doubt that Marciano expected that Art Pack's claim would be vigorously, even unjustly opposed, for anything more than a de minimis award to Art Pack,  was put to rest by the periodic entrances and telling commentary of Marciano's counsel into the Art Pack claim proceedings, the choicest parts of which are referenced by Art Pack in certain post trial filings.

Until the settlement was reached, the Trustee appeared uninterested in actually objecting to Art Pack's claim, despite the exchange of Summer, 2012. Once the May, 2013 settlement was reached the Trustee and Creditors Committee wasted no time. On August 9, 2013 the Trustee moved for an order liquidating and allowing Art Pack's claim in the amount of $37,628.31 or in the alternative entering a scheduling order. Exh. 2, Dkt 2232. Art Pack responded with factual and legal assertions, providing evidentiary support for the claim summary provided to the Trustee in June, 2012. Exh. 16, Dkt 2232; Exh. 17, Dkt 2293; Exh 18, Dkt 2298; Exh. 19, Dkt .2305. The Creditors Committee filed a joinder, exh. 20, Dkt. 2307. The Trustee filed a reply to Art Pack. Exh. 21, Dkt 2308.

## V.

## ART PACK'S CLAIM

Art Pack filed its claim on March 9, 2012 in advance of the March 10, 2012 claims

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

bar date. Exh.2, pgs. 13-50, Dkt.2232. The Trustee's wanted to authorize only Art Pack's

legal fees. The Trustee stated: "Perhaps the most efficient way to elucidate the reasons

for the Trustee's assessment of the actual damages component of the Claim is to

commence with the following, concededly-extensive quotation from an early email sent

by counsel for Art Pack to counsel for the Trustee as to the specific bases of Art Pack's

claim." Exh.2, p. 3:3-6, Dkt. 2232. The Trustee then included in its entirety an "Email

dated June 29, 2012 from Art Pack's Counsel to Trustee's Counsel." *Id.*

Ali Mohajeri was the President, CEO and single shareholder of Art Pack, Inc, an "S" Corporation.

Art Pack, Inc began business in a 1600 square foot rental facility in 1992, storing, packing and shipping fine art and high end designer furniture and fixtures. In 1999, Ellana quit her job as an operations manager for Federal Express to join her business skills with her husband to grow Art Pack Inc exponentially.

In 2002 their success resulted in a move to a 5500 square foot rental facility to accommodate Art Pack's growth. This move allowed gross sales to grow 50% from 2002 through 2005.

In October 2005, the Mohajeri's purchased a 13,000 square foot warehouse to accommodate Art Pack's current and expected near term growth. As part of their business plan, the Mohajeri's did extensive improvements to their new facility, including a 3,000 square foot state of the art mezzanine storage facility to create a further niche business for the storage of fine art. The Mohajeri's specifically built out the storage facility to meet Fine Art Insurance Carrier (e.g. Lloyd's of London, Chubb) regulations, making their building one of the few in the industry so recognized.

By the end of 2008, Art Pack Inc had again grown their gross sales by 50%. Art Pack's 2008 U.S. Income Tax return for an S corporation evidences the following: Gross receipts or sales: $2,018,158; Total Deductions: $722,116 (These deductions included officer compensation to Ali of $72,000, employee compensation to Ellana of $24,000 dollars and rent of $216,253); Ordinary business income: $847,985.

In Art Pack's 16,000 sq foot facility, limited to just the current business model, the conservative business projection for Art Pack, Inc was near term growth to in excess of $3,000,000 a year in gross sales with ordinary business income of between $1,500,000 and $2,000,000. For example, just the decision to build an art storage facility within the warehouse had resulted in $25,000 a month as of 2008 with projected growth to $50,000 a month in the near term.

The projection of $3,000,000/$1,500,000-$2,000,000 for Art Pack was independent of Art Pack's plan for near term expansion of its business to1) high end Art Installation and 2) Art Pack shipping of designated truckloads round trip from Los Angeles to New York of Art work and High End Furniture and Fixtures. Ali Mohajeri was born in 1947. Elana (sic) in 1966. Ali's father lived into his nineties and his mother is still alive in her nineties. Simply put, it was the Mohajeri's intention that Art Pack was a lifetime business. And, as the complaint indicates, Art Pack, Inc. was a labor of love. Given Ali's expected life span and Ellana's age it is reasonable that, left untouched by Marciano's malicious prosecution, the Mohajeri's would have continued to earn at least a million dollars a year from Art Pack, Inc for at least another 20 years. After all, it had already thrived for 16 years as of its Marciano forced sale in January, 2009 and Ellana would have been just 62 years old in 2028.

I have been doing trial work a long time. I am very comfortable that any reasonable trier of fact would find the evidence compelling that Art Pack, Inc and its sole shareholder Ali Mohajeri lost at least $20,000,000 because of Marciano's malicious and toxic abuse of Ali, Ellana and Art Pack, Inc. Consequently, I welcome any inquiries you have and will provide you with whatever information you need in support of this brief summary of Art Pack's damages.

I will also provide, when requested, the legal support for Art Pack's lost profits claim as well as the medical support for the claims referenced in the complaint. Exh.2, pgs. 6:18-7:15, Dkt 2232.

Trustee's Counsel responded to Art Pack's proffer and, among other factual and legal misconceptions, believed that Art Pack must "present evidence establishing that there were specific customers that it lost because of the pendency of the lawsuit with resultant quantifiable lost profits attributable thereto." Exh.2, pgs. 4:24-5:2; p. 46, Dkt. 2232. The Trustee's counsel also believed "the Court of Appeals decision in the Iskowitz Action underscores that conclusory assertions of lost business are insufficient – specific lost customers and the related lost profits must be established." *Id*.

The Trustee was uninterested in Art Pack's attempt to correct the Trustee's failure to understand California law regarding proof of lost profit damages. As this Court's eventual review of the filings in this case will show, the Objectors refusal to acknowledge applicable California law has informed almost every issue and every stage of this claim.

## VI.
## THE SETTLEMENT AGREEMENT, PROVIDING ALMOST $90 MILLION TO MARCIANO'S VICTIMS, WAS REASONABLE, PROVIDED GOOD FAITH IMPLEMENTATION AND ALLOCATION

Not only had Art Pack neither been notified nor invited to the Montreal settlement negotiations, let alone any settlement discussion, Art Pack was only provided a copy of the agreement after Art Pack had signed a confidentiality agreement.

Admittedly, the May 16, 2013 motion to approve the settlement, filed a week after the settlement had been reached and before Art Pack was even given the opportunity to execute a confidentiality agreement,  was not only judgment creditor centric, it failed to mention Art Pack at all. Exh.22, Dkt. 2073. On May 30, 2013, Judge Kaufman approved the settlement. Exh, 23, Dkt. 2122.

The settlement agreement established that the "'Judgment Creditor Claim Amount' shall mean the following: (a) for each of the Judgment Creditors Fahs, Tagle, Chanpnick, Choi and Abat: the principal amount of $10 million; (b) for G. Iskowitz, T. Iskowitz and Malkus: the aggregate principal amount of $36.25 million." Exh. 24, p. 47, paras. 33 and 34.

The settlement allocation of the claim amount for the judgment creditors was especially interesting. Half of the judgment creditors' state court judgments were for punitive damages, which is of course taxable. Art Pack is a corporation and will be taxed on all damages received, whether compensatory or punitive. Since Gary Iskowitz, the chairman of the Creditors Committee, is an accountant, the settlement agreement appears designed to provide the best argument possible that the IRS should not tax the judgment creditors distributions because each of them entered into a settlement and the amount of punitive damages in that settlement amount was not concrete enough for tax purposes.

The settlement agreement not only maximized the judgment creditors ability to avoid taxes but eliminated further appellate review by a state appeals court that had been harshly critical of the paucity of evidence supplied in the Iskowitz' first default hearing, a void that was not filled to any meaningful extent in the second trial.  See infa.

However, while all of the judgment creditors machinations, including their decision to file an involuntary bankruptcy rather than go to Canada and try and collect their awards in a country that limits pain and suffering damages to a few hundred thousand dollars, might bring a knowing smile to the faces of Art Pack's counsel, it was really irrelevant to the adjudication of Art Pack's claim in the bankruptcy process. Simply put, in evaluating the settlement and plan, Art Pack looked for ultimate equality of treatment and consideration of Art Pack's similarly situated claim to those of the other victims Marciano had specifically targeted with allegations of theft arising out of the same or similar transactions.

After all, the judgment creditors themselves informed the bankruptcy court that the filing was done to ensure equal treatments of the judgment creditors, a point Judge

MOTION TO WITHDRAW BANKRUPTCY REFERENCE

Kaufman emphasized in allowing the involuntary bankruptcy to proceed so as to ensure equitable treatment of creditors by furthering the "'prime bankruptcy policy of equal distribution among similarly situated creditors.' Danning v. Bozek (In re Bullion Reserve of North America), 836 F.2d 1214, 1217 (9th Cir.1988)." *In re Marciano*, 446 B.R. 407, 426 (Bankr. C.D. Cal. 2010).

Clearly, Art Pack had to be one of those similarly situated creditors. The 3rd Amended plan, filed June 20, 2013 confirmed that Art Pack would be so treated.. The judgment creditors were classified as unsecured Class 4B claims. Exh. 25, p. 30:13-19, Dkt. 2147. Art Pack was classified as an unsecured Class 4A claim. *Id*., at P:29:18-22. "Distributions on account of Judgment Creditor Claims shall be made on a Pro Rata basis based on the aggregate principal amount of all Allowed Class 4A & Class 4B Claims."*Id.*, at p.31:3-4.

Therefore, Art Pack, which was caught in the same Marciano cross hairs as the judgment creditors, would share pro rata in the $90 million settlement to the class. All other unsecured claims have been finalized, reducing the amount to be shared pro rata among Art Pack and the Judgment Creditors to approximately $89 million.

Art Pack has asked to be awarded in excess of $80 million, roughly divided between economic compensatory damages and punitive damages. See Art Pack's Response to Trustee's Objection and Art Pack's trial briefs. The *Fahs* court ruled that the $5 million in emotional distress damages awarded to each of the *Fahs* claimant was the absolute maximum amount possible under the law. Given its initial ruling, the *Iskowitz* appeal court would probably not have sanctioned the amounts awarded in the second default proveup completed just two months before the trimumvirate agreed to the May, 2013 settlement.

Art Pack has argued that, it too, should be awarded the maximum possible damages shown by the evidence, which still will be a lower number than if Art Pack had been permitted to try this case in front of a state court jury, as the *Fahs* advisory jury verdict demonstrated. However, if Art Pack's lost profits claim is evaluated with the

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

same broad acceptance accorded the judgment creditors claims, Art Pack has clearly produced substantial evidence that would support a $40 million plus lost profits award. And, unlike the other claimants who could prove up damages without opposition or even cross examination, Art Pack produced that evidence in an adversary hearing. Art Pack has produced evidence supporting a range of scenarios from $20 million to more than $40 million based on Art Pack's financial history and the testimony of economist Peter Formuzis. There has been no contrary evidence. It certainly can be argued that Art Pack should receive no more than a $14 million punitive damage award, which is what Gary Iskowitz was awarded in the March, 2013 proveup.  However, as *Fahs* stated, punitive damages are awarded at a higher ratio for economic damages because non economic awards of emotional distress often include, as did *Fahs*, a punitive element.

In any event, even if Art Pack's claim is liquidated for the full amount of damages requested by Art Pack in its final argument, the *Fahs* claimants would still receive approximately $5 million and Iskowitz' will still receive more than $18 million, which is more than the Canadian Decision thought likely. "In the course of the US bankruptcy appeal, the creditors were invited to mediate their claims with the trustee. Between October 17 and 19, 2011, a mediation took place presided by Cruz Reynoso, a former judge of the California Supreme Court. The judgment creditors agreed to resolve their claims for US$8,625,00 each to Fahs, Chapnick, Tagle and Abat, US$9,625,000 to Choi, US$17,250,000 to Gary Iskowitz, and US$2,250,000 to Theresa Iskowitz, plus interest." Exhibit 15, at ¶ 23. "On March 6, 2012, the hearing of the civil appeal in the related action of Iskowitz et al. took place in the California Court of Appeal (*Marciano v. Iskowitz*, 2d Cir. No. B216029, 219558). At the opening of the hearing, the panel issued the following tentative ruling: We do not think there was an abuse of discretion in the imposition of the terminating sanctions, which resulted in the entry of Marciano's default. But, the amount of damages, which were awarded on the default prove up, we felt were excessive."*Id*., at ¶ 28.  "During the exchange that followed, the Court pointed to the lack of evidence of ongoing treatment or of economic loss and said that the

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

amounts of damages awarded were often duplicative. In reply to a question from the Court, Gottlieb's attorney suggested that it would have been fair to award Iskowitz about $1,000,000 for all emotional harm, exclusive of punitive damages. [] Counsel for Iskowitz replied that the amount should not be less than 50% of the amounts granted by the Superior Court. The case is now under advisement and it is not clear if the Court of Appeal will suggest numbers or just remand. It bears noting that Iskowitz agreed during the mediation in the bankruptcy file to an amount of US$17,250,000. In all likelihood, he will be awarded less than that at the end of the day from the civil courts." *Id.*, at ¶ 29.

Simply put, Art Pack did not object to the settlement because it believed the Trustee when he said that $90 million  was the maximum amount reasonably available to Marciano's victims in the context of the involuntary bankruptcy initiated by the Judgment Creditors. Yes, Art Pack understood that agreeing to the settlement would mean a recovery reduced by potentially tens of millions of dollars but that seemed a reasonable compromise to Art Pack. Admittedly, Art Pack did not have the benefit of an unopposed prove up to secure maximum damages, but all claimants should have a  clear eyed view of what constitutes fair, equitable, sustainable, recoverable allocation of personal injury damage awards pursuant to California law. And all of Marciano's victims should, like Art Pack has done, acknowledge the entire community of Marciano's victims and embrace the opportunity to share, but share fairly and equitably, informed by the strictures of the California law on personal injury damages in general and intentional tort damages specifically.

In not objecting to the settlement, Art Pack understood that the Trustee, Judgment Creditors and Marciano had been fighting bitterly among themselves for years and they had only recently collapsed into each others arms with the helpful push of Canadian Jurists. Art Pack further understood that, if treated fairly and equitably, Art Pack would be an inconvenient financial truth to the Trustee, Creditors Committee and Marciano.

Art Pack was hopeful that the fiduciary duties imposed on the Trustee and Creditors Committee would trump any collusive effects of the Montreal settlement.  "A

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

1  bankruptcy or reorganization trustee is a fiduciary of each creditor of the estate." *Hall*
2  *v. Perry (In re Cochise College Park*), 703 F.2d 1339, 1357 (9th Cir.1983). "As such, he
3  has a duty to treat all creditors fairly and exercise that measure of care and diligence that
4  an ordinary prudent person under similar circumstances would exercise." *Id.*, at 157.
5  "Among the duties assumed by Committee members are 'fiduciary dut [ies] of undivided
6  loyalty and impartial service to all creditors.' *In re County of Orange*, 179 B.R. 195,
7  202–03 (Bankr.C.D.Cal.1995)." *In re Pierce*, 237 B.R. 748, 758 (Bankr.E.D.Cal.1999).
8  "[B]eing a member of the committee is not a position given to an unsecured creditor for
9  the primary purpose of furthering its own financial interests. (Citation). Membership on
10 the committee is not intended to grant to the members a financial advantage or priority
11 over their constituents." *Westmoreland Human Opportunities, Inc. v. Walsh*, 327 B.R.
12 561, 573 (W.D. Pa. 2005)

13      Art Pack expected that its claim would be evaluated by the Trustee and Creditors
14 Committee pursuant to their duty of impartial service.  And even if there were a collusive
15 element to the Montreal proceedings that would cause the Trustee and Creditors
16 Committee to lose sight of their fiduciary obligations, the equitable obligations of the
17 bankruptcy process would guide the judicial hand.

18      Art Pack submits that process includes California policy on evaluating economic
19 and non economic damages. The compensatory portion of the judgment creditors awards
20 were almost entirely non-economic, except for a small portion of the Iskowitz' amount,
21 which itself was unlikely to withstand a second review by the *Iskowitz* appeals court. On
22 the other hand, Art Pack's claim is entirely economic.

23      There is a distinct California policy on valuing economic and non economic
24 damages. "Economic damages are objectively verifiable monetary losses...Noneconomic
25 damages are 'subjective, non-monetary losses .'" *People v. Smith* 198 Cal.App.4th 415,
26 431 (2011)(internal citations and quotations omitted.). There are "inherent difficulties
27 in placing a monetary value on such [non economic] losses [it is] the fact that money
28 damages are at best only imperfect compensation for such intangible injuries." *Fein v.*

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

1    *Permanente Medical Group* 38 Cal.3d 137, 159-160 (1985)  The California Supreme

2    Court has repeatedly held that  "there is clearly a rational basis for distinguishing

3    between economic and noneconomic damages and providing fuller protection for

4    economic losses."  *Evangelatos v. Superior Court*  44 Cal.3d 1188, 1203 (1988)

5         Art Pack evaluated the settlement and the plan in the context of the equitable

6    context of the bankruptcy process and California law regarding malicious prosecution,

7    intentional tort causation and lost profits. Art Pack also was aware that the *Fahs* and

8    *Iskowitz* appeals courts had given the bankruptcy court context to evaluate  Art Pack's

9    claim. The bankruptcy court uses its equitable power "to examine and evaluate claims

10   that are valid and enforceable under state law, for the purpose of determining their

11   relative right to payment out of the estate compared with other, similarly valid claims.

12   Such an examination is an essential attribute of the bankruptcy process, because only

13   rarely are the assets of the estate sufficient to pay all valid claims before the bankruptcy

14   court. " *In re Murgillo*, 176 B.R. 524, 533 (9th Cir. BAP 1995).

## VII.

### THE STATE COURT PROCEEDINGS OF THE  JUDGMENT CREDITORS, STATE APPELLATE FINDINGS, AND THE FACTUAL AND LEGAL RELATIONSHIP OF ART PACK'S CLAIM TO THOSE OF THE JUDGMENT CREDITORS

19        The Iskowitz' litigation had begun on January 28, 2008, when Marciano filed

20   LASC No. BC384493 against Iskowitz' for misappropriation of  Marciano's money.

21   Iskowitz' filed a separate action for damages against Marciano on February 20, 2008 for

22   libel per se, with Gary also seeking damages for intentional infliction of emotional

23   distress and conspiracy to commit libel per se. The Iskowitz' lawsuit alleged that

24   beginning in 2006, Marciano had engaged in a deliberate campaign to harasss, intimidate

25   and spread vicious lies about Gary for the express purpose of ruining him. On June 23,

26   2008, the trial court consolidated the two actions, with the Iskowitz action being deemed

27   a cross complaint. *Gottlieb v. Iskowitz* , 2012 WL 2337290, *1,2.

28        On February 25, 2009 Marciano's second amended complaint was dismissed with

prejudice, his answer struck to the Iskowitz' cross complaint and default entered against Marciano.  "The [trial] Court doubts that if it were to look in the annals of jurisprudence it would find a case that even comes close to the discovery violations that the Court has seen in this particular case.[Marciano has] engaged in a consistent pattern of failure to cooperate with discovery." *Id*., *3.

The appeals court upheld the terminating sanctions because "[in] sum, given the egregious circumstances in this case, we cannot say the trial court abused its abused its discretion in selecting a terminating sanction." *Id.,* *9.

However, the $55 million damage award to Iskowitz was reversed because the trial court's award of damages on a default proveup was "so out of proportion to the evidence that it shocks the conscience of the appellate court." *Id*., *13.

The trial court had awarded damages which were "identical to the damages requested by  Gary, Theresa and Carolyn in their respective statements of damages." *Id*., *4. The judgment included both compensatory and punitive damages to each consisting of for a total award to Gary of $45 million; to Theresa, a total award of $5 million; and to Carolyn, for a total award to Carolyn of $5 million. *Id*., *4.

The appeals court found that each and every damage award was "totally unconscionable and without evidentiary justification." *Id.,* *11.  First, as to the libel per se action the trial court award of $5 million to Gary and $1million each to Theresa and Carolyn for loss of professional and personal reputation, was rendered in "the absence of any evidence of loss of clients, loss of potential clients, or loss of revenue [and therefore] the evidence does not begin to support the $7 million awarded to Gary, Theresa and Carolyn as damages for injury to reputation." *Id*., *11-12.

Second, the appeals court found that the $24 million awarded to Iskowitz' consisting of separate awards of $10 million in "emotional distress" damages to Gary, $1 million each to Theresa and Carolyn and an additional  $10 million for "shame, mortification and hurt feelings" to Gary and $1 million each to Theresa and Carolyn was shocking: "Despite the enormity of the award for emotional distress, neither Gary,

18

Theresa nor Carolyn's emotional distress was sufficiently severe to compel them to seek out psychotherapeutic treatment" and the remaining testimony was "brief" and "minimal." *Id.,* \*12. The court acknowledged that psychotherapy was not a prerequisite for an emotional damage award but "it stands to reason that severe emotional distress which would warrant an award of $24 million in damages would be supported by substantial damages incurred to treat such severe emotional distress." *Id.,*\*13. The appeals court further held the $24 million award was duplicative because subsumed within the request for emotional distress damages was the "request for the subspecies of damages denominated 'shame, mortification and hurt feelings.'" *Id.,*\*14.

Finally, "[b]ecause punitive damages must bear a reasonable relationship to compensatory damages or to the actual or potential harm to the plaintiff," the court also reversed the $24 million award of punitive damages. *Id*.,\*14.

The appeals court returned the case for trial before a different trial court within the following parameters: First, the damages were delimited by those pled in the complaint. Second, those damages could not include a separate award for shame, mortification and hurt feelings. Third, the "brief" and "minimal"evidence was not enough to sustain an award of even $1 million in emotional distress damages for either Theresa or Carolyn nor the $10 million in emotional distress to Gary. Fourth, the evidence did not "begin to support" the $5 million in reputation injury damages to Gary nor the $1million to Theresa or Carolyn.

The second default took place over several days in early, 2013, with basically the same evidence being produced. Gary Iskowitz, the chairman of the Creditors Committee was awarded $29 million divided between $15 million in compensatory and $14 million in punitive damages.

Given the directions of the *Iskowitz* Decision and the *Fahs* decision, infra, limiting emotional distress to a maximum of $5 million, further review and reduction by the *Iskowitz* Appeals Court appeared guaranteed. Although the Iskowitz' trial court had seemingly ignored the *Fahs* Decision, it was extremely unlikely that the *Iskowitz* appeals

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

court would do so, given *Iskowitz's* findings and the holding of the *Fahs* appeals court. In fact, comparing the language used by each court, it appeared likely that, given its original view of the paucity of evidence, the *Iskowitz* appeals court would reduce Gary's emotional distress damages of $10 million to $5 million or less, reduce Theresa's non economic damages to the one million dollars suggested by the Trustee at the first oral argument and similarly reduce Carolyn's emotional distress damages to one million dollars or less.

The *Fahs* Court had also upheld the terminating sanctions, determined that the default prove amount was grossly excessive, but took the other route mentioned by the Canadian Decision and fixed the maximum amount of damages at $10 million (ten million dollars) for each of the five *Fahs* plaintiff. Each $10 million award consisted of $5 million in emotional distress damages and $5 million in punitive damages. Gottlieb v. Fahs, No. B218087, 2012 WL 5310004 (Cal.Ct.App. Oct. 29, 2012).

"[Marciano's] acts were highly reprehensible and clearly did cause [each victim] great emotional distress" a "sizeable emotional distress award was appropriate" and "[i]n determining a proper award for emotional distress [the appeals court] is only to find a level higher than which an award may not go; it is not to find the 'right' level in the court's own view." Id at 19. This maximum amount was "compensatory damages awards to [each victim] of $5 million" based on the following: 1) each "clearly did suffer severe emotional distress" it is a "very sizeable award, and appropriately compensates [each] for their suffering" and 2) that Tagle "whose degree of emotional distress was at least equal to and possibly greater than that of [the others], requested $5 million for emotional distress damages in her statement of damages which (again) was a high, though not excessive, number  and 3) using the determinations of both the advisory jury and trial court, it is appropriate to "award each [ ] the same amount of compensatory damages and 4) the $5 million compensatory damages awards equal the amount of punitive damages awarded and with a "compensatory award for emotional distress that contains a punitive element, a small ratio between compensatory damages and punitive damages, such as a one-to-one ratio, is appropriate." *Id*., at *19.

## VIII.
## CONCLUSION

This is non core case which the District Court must review de novo. Judicial efficiency is no longer served in the bankruptcy court. Indeed, the "decision to limit the Bankruptcy Court's assistance with personal injury and wrongful death claims is consistent with the reason the District Court utilizes the Bankruptcy Court—its

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

bankruptcy expertise." *In re Mason*, 514 B.R. 852 at 857. "The Bankruptcy Court has familiarity and expertise with business related torts and statutory causes of action that relate to these contractual relationships, such as fraud and consumer liability statutes, but the District Court is better equipped to deal with violations of a person's rights protected by statutorily created causes of action." *Id.*, at 858.

The bankruptcy court had been involved in a titanic struggle lasting more than three years that, to the court's knowledge, had been completely resolved in a settlement in May, 2013. Until, of course, the same bankruptcy lawyers for the Trustee and Creditors Committee, who had been constantly before the court on bankruptcy issues, joined together to object to a personal injury claim that had not even been mentioned in the settlement agreement.

When Art Pack objected to final authorization of the $25 million in professional fees, including more than $15 million dollars for Trustee and Creditors Committee counsel, the unique relationship of bankruptcy practitioners was made evident. [THE COURT] "Art Pack's objection is like chutzpah to the extreme. I mean, the only reason there was a dime available to pay Art Pack out of this estate is because of the extraordinary efforts of these professionals at considerable risk to themselves." 9/ 18/14, RT 3:17-21; exh. 4.; [THE COURT] "So there was phenomenal risk in this case. The professionals did an incredible job... most likely to pay all creditors in full or at least a substantial portion...Art Pack should be thankful and grateful to these professionals for what has happened in this case. .it clearly isn't appreciating what this case was about and what these professionals did." *Id.*, 5:11-24; [TRUSTEE'S COUNSEL] "I'm saving my most special thanks until last because I can only imagine what an incredible strain and burden this case has been to this Court. I believe, if I'm not mistaken, that your Honor was fairly new to the bench when this case started." *Id.*, 15:21-16:9; THE COURT: "[I]t seems that there was definitely a strategy to overwhelm the Trustee's professionals and the Canadian professionals in hopes that they would just give up... I mean, really, when the Court has well-qualified, committed professionals involved, it's just much easier for

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

1   the Court to do its job because ..the Court can only do what it can do with the help of,
2   you know.. –[TRUSTEE'S COUNSEL] Ultimately, I know we --THE COURT: --
3   professionals.:[TRUSTEE'S COUNSEL -- relieved some of the burden of the Court, but
4   nonetheless, I know the Court and its staff carried an extraordinary responsibility and an
5   extraordinary burden. THE COURT: And the Court appreciates that and the District
6   Court too. I mean, that was a District Court judge on his way to being retired. And he
7   made sure that every one of those appeals was decided before he left the bench.
8   [TRUSTEE'S COUNSEL ] Well, and to the Court's credit, your Honor, if I may blow
9   your horn for you, he affirmed all of your decisions. He didn't reverse a single one. THE
10  COURT: So that was very -[TRUSTEE'S COUNSEL  So that says something for this
11  Court. *Id*., 20:5-21:4.

12      Art Pack will not engage on the level of appreciation due the Objectors other than
13  to note it would be a very interesting discussion on the choice of the United States as the
14  bankruptcy venue, rather than looking to Canada for equitable distribution, a jurisdiction
15  which limits pain and suffering damages to a few hundred thousand dollars.

16      In any event, that court appearance was 4 months ago and Art Pack should no
17  longer have to await a decision that statutorily and constitutionally will be reviewed de
18  novo. Even if this were a core case and judicial efficiency still resided in the bankruptcy
19  court, it would be time to have this claim liquidated by an article III judge.

20      The Framers sought to ensure that each judicial decision would be rendered, not
21  with an eye toward currying favor, but with the clear heads and honest hearts deemed
22  essential to good judges. Stern, 131 S.Ct. at 2609. "Periodical appointments, however
23  regulated, or by whomsoever made, would, in some way or other, be fatal to [a judge's]
24  necessary independence". Stern, 131 S.Ct. at 2619.  "Judicial independence is a
25  structural characteristic, not an empirical one. The question is whether the conditions of
26  an official's employment tend to promote independent judgment...see also Stern v.
27  Marshall, ⎯⎯ U.S. ⎯⎯, 131 S.Ct. 2594, 2609, 180 L.Ed.2d 475 (2011) (explaining that
28  the life tenure and salary protections of Article III were adopted to create the conditions

1   under which judges would be likely to act free from improper influence)." *Buckwalter*

2   *v. Nevada Bd. of Med. Examiners*, 678 F.3d 737, 743,744 (9th Cir.2012)

3       "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of

4   course requires an absence of actual bias in the trial of cases.  But our system of law has

5   always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349

6   U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).

7       A judge's remarks reveal such a high degree of favoritism or antagonism as to

8   make fair judgment impossible when they are of the nature to cause an objective,

9   disinterested observer to question the judge's impartiality. *United States v. Carlton*, 534

10  F.3d 97, 100 (2d Cir.2008), cert. denied555 U.S. 1038, 129 S.Ct. 613, 172 L.Ed.2d 468

11  (2008)

12      Not only must the facts be evaluated impartially, but Art Pack's claim warrants a

13  court experienced in the law informing the resolution of common law torts. There are

14  rulings on punitive damages and expert testimony that really do need to be looked at with

15  an Article III judge's knowledge and experience. However, for now, it is not the

16  correctness of the bankruptcy court's rulings but the impression they leave: The

17  comments to follow were made by the court at the end of the hearing/trial, after the

18  Objectors refused to cross examine Ali Mohajeri or Ellana Mohajeri and the bankruptcy

19  court refused to allow them to testify live as to certain items raised by the Objectors. The

20  bankruptcy court was explaining why the court preemptively precluded certain portions

21  of Dr. Mellman's testimony without a hearing.

22      THE COURT:  [A]nd [Mellman] went off of declarations that were prepared by

23      counsel, and he was a hired -- he had never -- really wasn't treating -- he wasn't a

24      treating physician for Doctor -- for Mr. Mohajeri, and he -- so it – the Court felt

25      it wasn't reliable. But, honestly, if he had come in, because this Court is a trier of

26      fact, it wouldn't have been credible. So we couldn't have him here, and it was --

27      it just -- when he's relying on what Mr. Mohajeri said in his declarations that were

28      prepared by counsel and in his deposition, you know, it just isn't credible when he

**MOTION TO WITHDRAW BANKRUPTCY REFERENCE**

said that that's the cause and he hasn't met with him individually and he wasn't the treating physician, and I think what people tell their doctor to be treated is different than what they put in a deposition or in a declaration post, you know, years later when there is a big pot of money they're trying to hit up. ¶ So I -- it just -- we -- this wasn't information couched from the trier of fact is what I guess I'm trying to say. April 10, 2014, RT 186:19-187:9.

Art Pack respectfully requests that, pursuant §§ 157(b)(2)(B) and 157(d), the District Court immediately withdraw the reference of Art Pack's claim for personal injury damages arising out of the malicious prosecution of Art Pack by Debtor George Marciano.

DATED: January 21, 2015   Respectfully Submitted,

STOLPMAN, KRISSMAN, ELBER & SILVER LLP

By:  s/ Dennis M. Elber
DONNA SILVER
DENNIS M. ELBER
Attorneys for Claimant, Art Pack
E-Mail: elber@skeslaw.com /
dsilver@skeslaw.com